Filed 6/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G056042 |
|      v. | (Super. Ct. No. 93CF2691) |
| FERNANDO VARGAS MEJIA, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge.  Reversed and remanded with directions.

Martin Lijtmaer for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Natasha Cortina and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

In 2016, the Legislature created a new law, which became effective in January 2017, allowing a person who is no longer in custody to file a motion to vacate a conviction because: "The conviction or sentence is *legally invalid* due to a prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." (Pen. Code, § 1473.7, subd. (a)(1), italics added.)[1]

Courts routinely interpreted the new statute to mean that in order to vacate a conviction, a person had to prove an ineffective assistance of counsel (IAC) claim under well-established standards. (*Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) But effective January 2019, the Legislature clarified: "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1), as amended by Stats. 2018, ch. 525, § 2.)

In 1994, defendant Fernando Vargas Mejia pleaded guilty to three drug crimes; he is now facing adverse immigration consequences (mandatory deportation). In 2017, Mejia filed a section 1473.7 motion; the trial court denied the motion, finding Mejia did not prove an IAC claim. In 2018, Mejia filed a timely appeal. The Attorney General concedes the 2019 amendment to section 1473.7 is retroactive.

We hold that to establish a "prejudicial error" under section 1473.7, a person need only show by a preponderance of the evidence: 1) he did not "meaningfully understand" or "knowingly accept" the actual or potential adverse immigration consequences of the plea; and 2) had he understood the consequences, it is reasonably probable he would have instead attempted to "defend against" the charges.

We find that Mejia made such a showing. Thus, we reverse the trial court's order denying Mejia's section 1473.7 motion. On remand, we direct the court to allow Mejia to withdraw his 1994 guilty pleas.

---

[1] Further undesignated statutory references will be to the Penal Code.

# I

## FACTS AND PROCEDURAL HISTORY

On September 16, 1993, the prosecution filed a three-count felony complaint alleging that Mejia had:  1) sold or transported cocaine; 2) possessed cocaine base for purposes of sales; and 3) possessed cocaine for purposes of sales.  (Health & Saf. Code, §§ 11352, subd. (a), 11351.5, 11351.)  On September 25, Mejia posted bail in the amount of $5,000.00.

On September 28, 1993, there was a preliminary hearing.  A Santa Ana police officer testified that two weeks earlier he saw Mejia in a car with another person named Black.  The officer spoke to Black, who told him that he and Mejia were both driving in separate cars when Black flagged down Mejia and "asked him for directions." Black asked Mejia if he could purchase a small amount of cocaine.  Mejia sold Black $80 worth of cocaine.  The officer found cocaine in Mejia's car.  The officer opined that "a portion was possessed for sales and that a portion was possessed for personal use." Mejia told the officer this was the first time he had sold cocaine, but "he had planned to sell the additional portion of cocaine should the opportunity arise."  The magistrate held Mejia to answer.  The following month, the prosecution filed an information alleging the same three counts alleged in the complaint.

On January 10, 1994, Mejia pleaded guilty to the three crimes.  Mejia initialed an immigration advisement on the plea form:  "I understand that if I am not a citizen of the United States the conviction for the offense charged *may* have the consequence of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."  (Italics added.)  The prosecution did not sign the plea form (indicating a "straight up" plea to the court).  The court granted probation with various conditions, including a 120-day jail sentence.

*The Section 1473.3 Motion*

On September 15, 2017, Mejia filed a section 1473.7 motion to vacate his 1994 drug convictions. Mejia attached a declaration to his motion.

Mejia averred, "I came to the United States when I was 14 years old. I came because my mother had moved here and I wanted to be with her and the rest of my family who was already here. Aside from visiting my sick father, I have remained in the United States my entire life. This is my home and I consider the United States my country." Mejia stated, "I was never a drug dealer and always worked hard for a living. Although it was a very long time ago, I remember feeling 'set up' by a guy who I had just met for the first time who flagged me down from his vehicle. My interactions with this man directly led to my arrest." At the time of Mejia's arrest he was 22 years old, married, and had an infant son.

Mejia stated that after the preliminary hearing he hired a private attorney (now deceased). Mejia stated that the attorney "hardly spoke to me or asked me any questions about what happened. He would just appear in court and tell me that we would be coming back at a future date until ultimately, I pleaded guilty to the charges." Mejia averred, "I remember the day I pleaded guilty. Before signing the papers, my attorney told me that I had no choice but to take the deal. He said that there was cocaine in my car so I was guilty and that if I didn't accept the 120-day sentence, I would get many years in prison. He told [me] it was the best deal I would get."

Mejia stated that his attorney "never asked me about my immigration status even though it was clear I was not American because all our conversations occurred through a Spanish interpreter. He never explained to me that I would be imminently deportable if I accepted the charges. He told me to sign all of the boxes on a form and to just do what he told [me] to do once we were in court." Mejia averred that: "Had I known that the charges would result an imminent deportation and would have precluded any defense to deportation, I would have chosen to fight the charges or try to negotiate a

4

result that would not destroy my chances of staying in the United States. By this point, I had already spent 8 years in the United States and I already considered this country my home. I never would have simply accepted responsibility if I knew I'd be deported."

*The Hearing on the Motion*

On November 3, 2017, the section 1473.7 motion came before the trial court. Mejia's counsel asked for a tentative ruling. The court indicated to counsel it would deny the motion: "I am not convinced your client would have turned down the plea bargain in this case *had he been properly or adequately advised* of immigration consequences, even if I were to assume that his attorney was deficient in that sense." (Italics added.) The court noted that Mejia "admitted to selling, and he was facing a maximum of six years and four months in prison." The court continued the matter to allow for additional briefing.

On February 2, 2018, the matter returned on the morning calendar. The court told Mejia's counsel "the supplemental information that you provided me is not sufficient to persuade me to deviate from my tentative." The court said, "I am not convinced that your client would have turned down *this deal had he been properly advised* of immigration consequences."[2] (Italics added.) Mejia's counsel replied, "Well, let's have my client testify and the court can judge his credibility." The court said, "I don't believe testimony today, years later, would be helpful to me." Counsel responded, "My client has a right to be heard in this case." Counsel said, "I think this is reversible error for you not to allow him to -- " The court interrupted, "Is that a threat, counsel?" Counsel replied, "It's not a threat. I just think it's reversible error. I think he should be allowed to testify." The court said, "Well, then so be it. Then I can be reversed."

---

[2] It appears that the parties and the court were under the impression that Mejia's 1994 guilty pleas were the result of a "deal" or a plea bargain, rather than a plea to the court.

5

After further discussion with counsel, the court agreed to conduct an evidentiary hearing that afternoon.

Mejia testified that he was 14 years old when he came to the United States from Mexico in 1986. Mejia said he came because his six siblings, his mother, and the rest of his family was living in the United States, only his father was still in Mexico. Mejia testified that he started working in his brother's paint shop three days after he arrived. When Mejia was arrested in 1993, he was 22 years old and married, he had an infant child, and a steady job. After he was arrested, Mejia said that he put some money together to pay for a bail bond; he planned to go visit his father who was sick in Mexico, but Mejia's father died shortly thereafter, so he no longer had any family ties to Mexico. Mejia said that he used the money to hire a private lawyer.

Mejia testified that his attorney never discussed the possible immigration consequences of his guilty plea. Mejia said that his attorney did not explain to him that a drug sales crime is considered an aggravated felony under federal law, which requires deportation. When asked, "had your attorney explained to you in 1993 that this case would result in deportation, would you have taken the deal?" Mejia responded, "I would have never accepted it if I had known that this would harm me in the future." Mejia said that "at the time I had one child, one wife, absolutely nothing in Mexico. My father was deceased. I wanted to live a full life here, not three months in jail. It could be six months, but my life here." When asked, "Just to clarify, you would have accepted a longer sentence for an assurance you could stay in the United States?" Mejia responded, "I would prefer that to live here with my family than be separated from them." Mejia testified that he was still married to his wife, and now had two grown children.

Later that same day, the trial court filed a 13-page order, denying the section 1473.7 motion. At the outset, the court stated that it was analyzing Mejia's claim "based on ineffective assistance of counsel. The question then becomes whether he has established such a claim by a preponderance of the evidence." After analyzing Mejia's

6

section 1473.7 motion under well-established IAC standards (*Strickland*), the court concluded that Mejia "has failed to make a sufficient showing that he would have declined the plea and risked going to trial had he been *more fully apprised* of its immigration consequences." (Italics added.)

*The Instant Appeal*

In 2018, Mejia filed a timely appeal. Effective in 2019, while the matter was pending in this court, the Legislature amended the statute: "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) We invited the parties to file supplemental briefs. Both parties agree the Legislature's amendment is a clarification of existing law and therefore applies to nonfinal judgments, including this appeal. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment"].)

II

DISCUSSION

Mejia argues that section 1473.7 as amended allows a noncitizen defendant to vacate a guilty plea if he or she "did not understand the true implications of the plea deal before accepting it and where the defendant suffered prejudice. The key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken, and not whether their attorney technically provided IAC." We agree.

In order to resolve this matter, we need to interpret section 1473.7 as amended. Statutory interpretation is a question of law; our review is de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95-96.) We attempt to ascertain the intent of the Legislature so as to effectuate the purpose of the statute. (*People v. Jefferson* (1999) 21

7

Cal.4th 86, 94.) Generally, we first look to the language of the statute, giving the individual words "their 'usual and ordinary meanings.'" (*People v. Lawrence* (2000) 24 Cal.4th 219, 230-231.) "We do not, however, consider the statutory language 'in isolation.'" (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.'" (*Ibid*.)

*A. Background and Context*

The current rules and procedures regarding noncitizens—and their respective rights within the criminal justice system—are based on decades of changes and advancements within the legislative, executive, and judicial branches of government, at both the state and federal levels. Before interpreting and applying section 1473.7, it is helpful to briefly review some of those changes and advancements.

*1. Before Padilla*[3]

In 1969, the California Supreme Court "recognized that a substantial portion—probably the vast majority—of criminal cases are disposed of through the process of plea bargaining." (*In re Tahl* (1969) 1 Cal.3d 122, 138-139 (conc. & dis. opn. of Peters, J.).) As such, courts have developed procedural protections for defendants who plead guilty.[4] For instance, these procedures require a knowing, intelligent, and express waiver of a defendant's constitutional rights. (*Ibid*., citing *Boykin v. Alabama* (1969) 395 U.S. 238.) Defendants must also be informed of the direct consequences of their guilty pleas. (*Bunnell v. Superior Court* (1975) 13 Cal.3d 592, 605.) However, for many years

---

[3] *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*).

[4] We will be referring to guilty pleas throughout this opinion, but the same principles apply to pleas of nolo contendere (no contest).

the immigration ramifications for noncitizen defendants were considered indirect or collateral consequences of a guilty plea.  (See *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 198.)

Effective in 1977, the Legislature required courts to provide additional protections for noncitizen defendants:  "Prior to acceptance of a plea of guilty . . . to any offense punishable as a crime under state law . . . the court shall administer the following advisement on the record to the defendant:  [¶]  If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."  (§ 1016.5, subd. (a).)

A defense attorney's "affirmative misrepresentation" about immigration consequences could, in some cases, constitute ineffective assistance.  (*In re Resendiz* (2001) 25 Cal.4th 230, 247.)  However, unless there was an inquiry by a defendant, counsel could generally rely on the court's immigration advisement.  (*People v. Quesada* (1991) 230 Cal.App.3d 525, 535-536.)  That is, unless counsel gave patently inaccurate advice (misadvice), the failure to discuss immigration consequences did not support an IAC claim because counsel's performance did not fall below an objectively reasonable standard.  (*Strickland*, *supra*, 466 U.S. at pp. 691-692.)

### 2.  Padilla and Subsequent Advancements

In 2010, the United States Supreme Court recognized that:  "The landscape of federal immigration law has changed dramatically over the last 90 years.  While once there was only a narrow class of deportable offenses . . . , immigration reforms over time have expanded the class of deportable offenses . . . .  The 'drastic measure' of deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes."  (*Padilla*, *supra*, 559 U.S. at p. 360.)  The Court rejected the former "affirmative misadvice" test for IAC, holding that defense attorneys have an obligation to understand

9

and accurately explain the immigration consequences of a guilty plea: "Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less." (*Id.* at p. 374.)

Effective January 1, 2016, the California Legislature enacted two new Penal Code sections, which codified and expanded the protections for noncitizen criminal defendants. (§§ 1016.2, 1016.3.) In section 1016.2, subdivision (c), the Legislature noted that: "In [*Padilla*], the United States Supreme Court found that for noncitizens, deportation is an integral part of the penalty imposed for criminal convictions. Deportation may result from serious offenses or a single minor offense. It may be by far the most serious penalty flowing from the conviction."

"Defendants who are misadvised or not advised at all of the immigration consequences of criminal charges often suffer irreparable damage to their current or potential lawful immigration status, resulting in penalties such as mandatory detention, deportation, and permanent separation from close family. In some cases, these consequences could have been avoided had counsel provided informed advice and attempted to defend against such consequences." (§ 1016.2, subd. (e).) "Once in removal proceedings, a noncitizen may be transferred to any of over 200 immigration detention facilities across the country. Many criminal offenses trigger mandatory detention, so that the person may not request bond. In immigration proceedings, there is no court-appointed right to counsel and as a result, the majority of detained immigrants go unrepresented. Immigration judges often lack the power to consider whether the person should remain in the United States in light of equitable factors such as serious hardship to United States citizen family members, length of time living in the United States, or rehabilitation." (§ 1016.2, subd. (f).)

"The immigration consequences of criminal convictions have a particularly strong impact in California. One out of every four persons living in the state is foreign-

10

born.  One out of every two children lives in a household headed by at least one foreign-born person.  The majority of these children are United States citizens.  It is estimated that 50,000 parents of California United States citizen children were deported in a little over two years.[5]  Once a person is deported, especially after a criminal conviction, it is extremely unlikely that he or she ever is permitted to return."  (§ 1016.2, subd. (g).)  "It is the intent of the Legislature to codify [*Padilla*] and related California case law *and to encourage the growth of such case law in furtherance of justice and the findings and declarations of this section*."  (§ 1016.2, subd. (h), italics added.)

"Defense counsel shall provide accurate and affirmative advice about the immigration consequences of a proposed disposition, and when consistent with the goals of and with the informed consent of the defendant, and consistent with professional standards, defend against those consequences."  (§ 1016.3, subd. (a).)  "The prosecution, in the interests of justice, and in furtherance of . . . Section 1016.2, shall consider the avoidance of adverse immigration consequences in the plea negotiation process as one factor in an effort to reach a just resolution."  (§ 1016.3, subd. (b).)

*B.  Section 1473.7*

Effective January 1, 2017, the Legislature further expanded the protections for noncitizen criminal defendants.  The new statute provided, in relevant part:  "A person no longer imprisoned . . . may prosecute a motion to vacate a conviction . . . : [¶]  (1) . . . [that] is legally invalid due to a prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty . . . ."  (§ 1473.7, subd. (a).)  Section 1473.7, subdivision (e)(1), which remains unchanged, provides:  "*The court shall grant the motion* to vacate the conviction or sentence if the moving party

_____

[5] Mejia and his wife have two adult children that were born in the United States.

11

establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)." (Italics added.)

After its enactment, California courts uniformly interpreted section 1473.7 under the existing and long-standing rules for constitutional IAC claims. (See, e.g., *People v. Espinoza* (2018) 27 Cal.App.5th 908, 917-918 [defendant met his burden under section 1473.7 by establishing both *Strickland* prongs]; *People v. Tapia* (2018) 26 Cal.App.5th 942, 955 ["Having failed to establish either prong—deficient performance or prejudice—Tapia has not proven ineffective assistance"]; *People v. Olvera* (2018) 24 Cal.App.5th 1112, 1118 ["Because Olvera has not established that his counsel rendered deficient performance, he is not entitled to relief"].)

Effective January 1, 2019, the Legislature amended section 1473.7, subdivision (a), to add: "(1) . . . A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." In amending the statute, the Legislature noted "that a finding based on prejudicial error may, but need not, include a finding of ineffective assistance of counsel and that the *only finding that the court is required to make* . . . is whether the conviction is legally invalid due to prejudicial error *damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept* the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." (Legis. Counsel's Dig., Assem. Bill No. 2867 (2017-2018 Reg. Sess.), italics added.) The Legislature's declared intent was "to provide clarification to the courts regarding Section 1473.7 of the Penal Code to ensure uniformity throughout the state and efficiency in the statute's implementation." (*Ibid*.)

At the time of the writing of this opinion, only one published opinion has interpreted section 1473.7 as recently amended. (*People v. Camacho* (2019) 32 Cal.App.5th 998 (*Camacho*).) In *Camacho*, defendant pleaded no contest in 2009 to a charge of possessing marijuana for sales. (*Id*. at pp. 1001-1002.) In 2017, defendant moved to vacate the conviction. Defendant stated his attorney "never discussed

12

immigration issues or any settlement offers, nor was he instructed to consult with an immigration attorney. [¶] . . . Defendant's attorney never told defendant of the consequences of [the] plea . . . . Counsel did not tell defendant that he could take the case to trial or discuss the possible outcome. Defendant declared: 'I would have never taken the plea . . . if I would have known that it would have not permitted me to obtain legal status . . . . I have two United States citizen children and my wife is a United States citizen. I cannot leave them here in the United States without being [there] to support them.'" (*Id.* at p. 1001.) The trial court denied the motion, finding that counsel's representation "did not fall below the standards of what was reasonably expected . . . at the time." Further, the trial "court noted defendant's concern was not getting jail time, and found no facts indicating prejudice." (*Id*. at p. 1004.)

The Second District Court of Appeal disagreed. The court "remanded to the superior court with instructions to grant the motion and to vacate the conviction." (*Camacho*, *supra*, 32 Cal.App.5th at p. 1012.) The court held that the amended statute did not require a finding of an error by defendant's counsel. Rather, the court held that the law required an error on the part of the defendant. The court also concluded that the record established such an error. That is, the record in *Camacho* established "*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States." (*Id*. at p. 1009, italics added.)

As far as prejudice, *Camacho* held: "Because the errors need not amount to a claim of ineffective assistance of counsel, it follows that courts are not limited to the *Strickland* test of prejudice, . . . [a] reasonable probability of a different outcome in the original proceedings absent the error." (*Camacho*, *supra*, 32 Cal.App.5th at p. 1009.) Rather, the court found that a "defendant may show prejudice by 'convinc[ing] the court [that he] would have chosen to lose the benefits of the plea bargain despite the possibility or probability deportation would nonetheless follow.'" (*Id*. at p. 1010.) The court relied, in part, on the Supreme Court's recent holding in *Lee v. United States* (2017) __ U.S. __

13

[137 S.Ct. 1958, 1967] (*Lee*) [a noncitizen defendant demonstrated a "reasonable probability" that he "would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a 'Hail Mary' at trial"].)

The *Camacho* court found "compelling" evidence of prejudice in the record from the trial court. Defendant "was brought to the United States over 30 years ago . . . . Defendant is, and at the time of his plea was, married to a United States citizen with an American citizen son, and now also an American citizen daughter. At the time of his plea, defendant was employed . . . and now works as a tow truck driver. Defendant has no other adult criminal convictions." (*Camacho*, *supra*, 32 Cal.App.5th at p. 1011.) The *Camacho* court concluded that "defendant showed by a preponderance of evidence that he would never have entered the plea if he had known that it would render him deportable, the errors which damaged his ability to meaningfully understand, defend against, or knowingly accept the adverse immigration consequences of a plea were prejudicial. The [superior] court was thus required to grant the motion to vacate the conviction as invalid." (*Id*. at pp. 1011-1012.)

## C.  Analysis and Application

We agree with the Second District Court of Appeal's analysis in *Camacho*, *supra*, 32 Cal.App.5th 998. Under the plain language of section 1473.7 as amended, it is apparent that a defendant is no longer required to prove an IAC claim in order to have his or her convictions vacated and declared legally invalid: "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (§ 1473.7, subd. (a)(1).) Rather, a superior court is required to make a finding of legal invalidity if the defendant simply proves by a preponderance of the evidence a "prejudicial error damaging the moving party's ability to *meaningfully understand*, defend against, or *knowingly accept* the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." (§ 1473.7, subd. (a)(1), italics added.)

14

While codifying the United States Supreme Court's holding in *Padilla*, *supra*, 559 U.S. 356, our Legislature also expressed an intent to "encourage the growth of such case law in furtherance of justice . . . ." (§ 1016.2, subd. (h).)  Consistent with that legislative intent, we agree with the *Camacho* court's analysis that the focus of the inquiry in a section 1473.7 motion is on the "*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation and permanent exclusion from the United States."  (See *Camacho*, *supra*, 32 Cal.App.5th at p. 1009, italics added.)

We also agree with the *Camacho* court as to the prejudice component of the amended statute.  That is, a "prejudicial error" occurs under section 1473.7 when there is a *reasonable probability* that the person would not have pleaded guilty—and would have risked going to trial (even if only to figuratively throw a "Hail Mary")—had the person known that the guilty plea would result in mandatory and dire immigration consequences.  (See *Lee*, *supra*, __ U.S. __ [137 S.Ct. at p. 1967] ["Lee has adequately demonstrated a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation"].)

"Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea . . . .  [¶]  But common sense . . . recognizes that there is more to consider than simply the likelihood of success at trial.  The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea.  [Citation.]  When those consequences are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive."  (*Lee v. United States*, *supra*, __ U.S. __ [137 S.Ct. at p. 1966].)  In a postconviction setting, courts should not simply accept a defendant's statement of regret regarding the plea, courts should also "look to contemporaneous evidence to substantiate a defendant's expressed preferences."  (*Id*. at p. __ [137 S.Ct. at p. 1967].)

Here, Mejia's undisputed testimony at the evidentiary hearing established that he did not "meaningfully understand" or "knowingly accept" the mandatory

15

deportation consequences when he pleaded guilty in 1994. (See § 1473.7, subd. (a).) Mejia said that he would have never pleaded guilty had he known and understood "that this would harm me in the future." When ruling on the motion, the trial court made no express or implied credibility determinations on this point, as the denial was based solely on IAC considerations. That is, the court concluded—under the prevailing IAC standards at the time of the guilty pleas—that "there is no indication *counsel gave* . . . affirmatively incorrect advice." (Italics added.) In short, Mejia plainly established his own "error" within the meaning of section 1473.7, subdivision (a).

As far as the prejudice component, there is contemporaneous evidence in the record to substantiate Mejia's claim that he would not have pleaded guilty had he known about the mandatory and dire immigration ramifications. Similar to *Camacho*, there is compelling evidence in the record that at the time of his guilty pleas, Mejia had been living in the United States for eight years, since he was 14 years old. At the time of his guilty pleas, Mejia's wife and infant son were living in the United States, as well as his mother and six siblings. Indeed, Mejia's only remaining family tie to Mexico was his father, who passed away just before Mejia entered his guilty pleas. Moreover, as the lower court acknowledged, there are some lingering questions about the strength of the underlying evidence: "The preliminary hearing transcript leaves several remaining uncertainties; that someone would 'flag down' a complete stranger by 'pointing his nose' and asking to purchase cocaine is unusual. Equally odd is that 'Black' would approach the officer and admit he had done so."

Another contemporaneous substantiation of prejudice is that unlike most guilty pleas, this was a "straight up" plea directly to the court rather than a negotiated disposition. Mejia was out on bail when he pleaded guilty to all three charged crimes; the court granted Mejia three years formal probation with a 120-day jail sentence. But had Mejia gone to trial and been found guilty, it is simply not realistic to imagine that the court would have then imposed the maximum prison sentence (six years, four months).

16

Mejia had no criminal record and this was an unsophisticated crime.  It is much more likely that even after a trial, the court would have still granted Mejia probation, but with more local custody time (up to a year in jail), or perhaps a lower term prison sentence.  (See *In re Lewallen* (1979) 23 Cal.3d 274, 278-281 [under principles of constitutional due process, a trial court may not penalize a defendant for exercising his or her right to a jury trial, nor may it promise leniency if a defendant refrains from exercising that right].)

In short, if Mejia had meaningfully understood the mandatory immigration consequences of his guilty pleas in 1994 (permanent deportation), versus the potential risks and rewards of going to trial, it is reasonably probable that he would not have pleaded guilty.  Thus, Mejia has affirmatively established a "prejudicial error" within the meaning of section 1473.7, subdivision (a)(1).

Finally, we agree with the disposition in the *Camacho* opinion*:*  "The appropriate remedy is to direct the trial court to grant the motion."  (*Camacho*, *supra*, 32 Cal.App.5th at p. 1012, citing *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 81 ["The trial court erred in denying Ogunmowo's section 1473.7 motion to vacate his conviction. . . .  Accordingly, we reverse the order and remand the matter to the trial court to allow Ogunmowo to withdraw his guilty plea"]; *People v. Espinoza*, *supra*, 27 Cal.App.5th at pp. 917-918 ["Therefore, the trial court erred in denying defendant's section 1473.7 motion to vacate his conviction. . . .  Accordingly, we reverse the order and remand the matter to the trial court to allow defendant to withdraw his guilty plea"].)

The Attorney General concedes that *Camacho*, *supra*, 32 Cal.App.5th 998, was correctly decided, but he distinguishes *Camacho* based on its facts.  For instance, the Attorney General argues that "unlike the defendant in *Camacho*, who was 24 years old and had lived in the U.S. for 22 years when he pleaded nolo contendere [citation], here [Mejia] was younger (21 years old) and had lived in the U.S. for less time (eight years) when he pleaded guilty."  The Attorney General also argues that:  "Consistent with *Camacho*, the superior court properly concluded that even if [Mejia] was *otherwise*

*advised* about the immigration consequences of pleading guilty, it is not reasonably probable that given his circumstances in 1994, 21-year-old [Mejia] would have rejected the favorable plea agreement." (Italics added.)

The Attorney General's arguments are unpersuasive. The factual distinctions between this case and *Camacho* are relatively minor. The bottom line here is that under the new paradigm of section 1473.7 as amended, Mejia plainly established that he did not "meaningfully understand" or "knowingly accept" the immigration consequences of his guilty pleas, just as the defendant in *Camacho* did not "meaningfully understand" or "knowingly accept" the immigration consequences of his no contest plea. (See § 1473.7, subd. (a)(1).) Further, as far as prejudice, the trial court's analysis in this case was wholly rooted in the constitutional IAC framework, which the Legislature has now rejected as unnecessary. The court repeatedly (and arguably correctly at that time) weighed the prejudicial effect of the advice (or lack of advice) Mejia received from his counsel (IAC), rather than weighing what Mejia *meaningfully understood* or *knowingly accepted* regarding the dire immigration consequences of his guilty pleas.

In sum, we have taken into account section 1473.7 as amended, and have considered it within the broader context of the Legislature's implied and explicit intent regarding the treatment of noncitizen criminal defendants. Under that analytical framework, Mejia plainly established a reasonable probability that he would not have pleaded guilty and likely would have taken his chances at trial had he meaningfully understood the certain and dire immigration consequences of his 1994 guilty pleas.

## III

## DISPOSITION

The order is reversed and the matter is remanded to the trial court to allow Mejia to withdraw his 1994 guilty pleas.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.

19